**HOWARD, Admr., Appellant and Cross–Appellee,**

v.

**SEIDLER, Appellee; Dattilo et al., Appellees and Cross–Appellants.**

[Cite as *Howard v. Seidler* (1996), 116 Ohio App.3d 800.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 94 C.A.70.

Decided Dec. 4, 1996.

*James L. Messenger, Bernard D. Marcus* and *Scott D. Livingston,* for appellant and cross–appellee.

*John C. Pfau,* for appellee Laura C. Seidler.

*Charles L. Richards,* for appellee and cross–appellant David Dattilo.

*William M. Oldham,* for appellee and cross–appellant James Hall.

GENE DONOFRIO, Judge.

Plaintiff-appellant, Debra H. Howard, administrator of the estate of her son, Vencinn I. Howard, appeals from a judgment entered upon a jury verdict in this wrongful death and survivor action.

On October 17, 1990, Vencinn I. Howard, then eleven years of age, was struck by a car and killed. The evidence at trial established that, on the evening in question, Vencinn had attended a football game at Fitch High School stadium in Austintown, Ohio. Shortly after 8:00 p.m., Vencinn began walking toward the Westchester apartments, located off Idaho Road, where he lived.

On his way home, Vencinn met and talked with a girl, Shayna Jenkins, outside Watson Elementary School. As Vencinn was talking with Shayna, a number of older, white teenagers appeared and began taunting Vencinn and Shayna with racial and sexual slurs. At some point, one or more of the teenagers began chasing Vencinn, who was black. Vencinn subsequently ran out into the middle of Idaho Road and was struck by a car being driven by defendant-appellee Laura Seidler. Vencinn died approximately one hour later due to massive internal injuries.

Appellant subsequently filed a wrongful death and survival action against appellee Seidler and against the seven teenagers who had allegedly been involved in chasing Vencinn. Prior to trial, appellant received $101,000 in settlement with defendant Michael A. Morgan and $9,000 in settlement with defendant April Demler. Appellant later elected not to proceed against defendants Wayne King and Heather Reese.

A jury trial began on January 25, 1994 on appellant's claims against appellee Seidler and against defendants-appellees/cross-appellants David Dattilo, James L. Hall, and Richard Sheppard.

Prior to opening statements, the parties stipulated to the admissibility of the police report of the accident. The next day, counsel for appellant and counsel for appellee Seidler went on the record and agreed that references to insurance on the police report would be deleted. At that time, the court indicated that appellant's oral motion *in limine* was granted. However, the record at page 27 of the transcript does not in any way reflect the grounds of appellant's oral motion *in limine* or with what the motion *in limine* was concerned.

During opening statements, counsel for appellee Seidler made reference to the police report and stated that there was no suggestion in the report that Seidler's speed was unreasonable or excessive and that there was no indication in the report that Seidler had contributed to causing the accident.

After the start of trial, the parties met out of the presence of the jury and argued as to the exact terms of appellant's oral motion *in limine*. Appellant's counsel argued that, in his oral motion *in limine*, he had intended to request that all references to any citations or lack of citations in the police report be excluded at trial. According to appellant's counsel, this included any reference at all to conclusions made by the police officers. Conversely, counsel for appellees argued that while they had agreed not to make mention of the fact that there were no citations issued, there had been no stipulation on conclusions made by the police. Ultimately, the trial court ruled that all conclusions in the report were admissible.

At trial, appellant alleged that Seidler had negligently failed to keep a proper lookout and had failed to obey the speed limit. Seidler's principal defense was

that even if she had been negligent, the accident was unavoidable. To rebut this defense and prove that the accident was avoidable, appellant presented the testimony of a lighting expert, Walter Kosmatka, and an accident reconstruction expert, Professor David L. Uhrich.

Kosmatka testified that he performed a lighting analysis of the scene in order to determine the distance from Idaho Road where Seidler could have first seen or detected Vencinn. Kosmatka testified that he had originally determined that, based upon his observations of the scene and assuming that Vencinn was wearing a white shirt, Seidler could have first seen Vencinn at least 222 feet, and possibly as far back as 305 feet, away as she drove down Idaho Road. Later on, Kosmatka gave the following testimony:

"Q   Okay.  And what did your analysis reveal?

"A   It revealed that at approximately 305 feet there—the light, the lightness of a light-colored or white-colored shirt could have been seen by an observer.

"Q   Three hundred and five feet?

"A   That was my initial calculation, yes, 305.

"Q   Now, after you have seen the clothing here before testifying, has that initial judgment in any way been revised?

"A   Well, I chose to do a second analysis based on the fact that maybe the color was more off-white, and the fact that the blue stripes would have tended to dilute the overall brightness.  So I measured the stripes, and I measured the white bands between them.  And using a number, a reflectance number for the white of approximately 60 percent, which is the beginning of the gray area, definitely an off-white, and a lesser number of 8 percent for the blue, I calculated an average weighted reflectance now of approximately 40 and a half percent compared to the 70 percent I used initially.  If the whole shirt were that color— and, of course, you have to remember it wasn't, but—so this is a limiting case analysis.  If that's the only part we would have seen, the distance would have been reduced to slightly over 220 feet, which is about two-thirds of the original 305 feet.  Still a significant distance, 70 yards.

"Q   And does this assume the fact that Vencinn Howard was running toward the automobile at the time?

"A   As a matter of fact, it doesn't.  It assumes a stationary static object.  The numbers that all this was based on were derived from tests that were done with actual observers.  And in all cases the object was static.

"Q   Would it make a difference, sir, if the object was moving and arms were pumping as opposed to a static object?

"A   I think it's fairly well accepted that movement, if you will, attracts attention, specifically when it's in more in the near periphery of the eye.   * * *

" * * *

"Q   Mr. Kosmatka, given your analysis of this matter and your investigation and the tests that you performed, together with all the documents that you have reviewed and studied, do you have an opinion based upon reasonable scientific certainty as to what distance away from Vencinn Howard at the time of impact the defendant, Laura Seidler, could have seen him?

"MR. PFAU:  Objection.

"THE COURT:  Overruled.

"A   Yes.

"Q   And what is that opinion?

"A   My opinion is that she could have seen Vencinn Howard at at [sic] least 222 feet, and possibly as far as 305 feet."

On cross-examination, Kosmatka gave the following testimony:

"Q   * * * You reduced as a result of the document, the garment not being all white and being somewhat different than all white as we have gone through earlier that the possibility of seeing Vencinn by Laura Seidler on this evening would have been reduced from approximately 305 feet to 222 feet;  correct?

"A   Yes.

"Q   And are those figures exact?   I mean, can we say it's exactly 222 feet? There's some variance there?

"A   This is based on the average of several observers, and that's right, it's the most probable.   I certainly couldn't call it exact.   It's the most probable distance.

" * * *

"Q   Mr. Kosmatka, when did you form your first opinion of 305 feet?

"A   I would—I just would be guessing to say it was just around the time I wrote this.

"Q   Around October?

"A   Yes.

"Q   Or '93?

"A   Yes.

"Q   And I'm confused.   When did you change it to 220?

"A   As I indicated earlier, I saw the clothing this morning, and it was apparent that I should revisit this to see what kind of impact it had.   So I did it this morning.

"Q   So the 220 opinion was formed this morning?

"A   Yes.

"Q   After you saw this clothing?

"A   Yes.

"Q   Where did you get the idea that this youngster was wearing a white sweatshirt?   Who told you that?

"A   I believe it came from the family?   I'm not sure.

"Q   Okay.   Well, anyway, what you saw this morning was enough for you to change your opinion by 30 percent;   wasn't it?

"A   Yes."

Based upon Kosmatka's testimony as to the range of detection distance, appellant then asked Professor Uhrich to give an opinion as to whether the accident could have been avoided had Seidler merely taken her foot off the accelerator for an instant when she could have first seen Vencinn.   Upon objection by Seidler's counsel, the trial court prevented Uhrich from using Kosmatka's maximum detection distance of 305 feet:

"Q   Okay.   Now can you also walk us through your analysis with respect to the longer detection distance that Mr. Kosmatka had in his first report?

"MR. PFAU: I'm going to object to that.   There's no foundation for the longer detection distance.   Kosmatka has already indicated 305 feet was not the detection distance.

"MR. LIVINGSTON: I believe the testimony yesterday was that it was a range between 222 to 305 feet.

" * * *

"Q   Can you walk us through the analysis of where Vencinn would have been had the driver seen Vencinn at the 305–foot detection distance and then coasted after seeing him?

"A   Yes.

"THE COURT: And your objection is that there is no evidence as to the further distance?

"MR. PFAU: Yes, that Mr. Kosmatka testified that it was 222 feet, not 305.

"MR. LIVINGSTON: Your Honor, I believe he testified that it was a range, and he said that was because it wasn't a—he couldn't be precise.

"THE COURT: Because of the lighting on the clothing?

"MR. LIVINGSTON: Right. He gave a range. He didn't give a precise figure.

"MR. RICHARDS: Your Honor, in my cross-exam, he stated flatly that he changed his opinion 30 percent because of the difference of clothing.

"THE COURT: *I'm going to not allow any testimony on this longer range because of what I believe his testimony was.*" (Emphasis added.)

Even using the lesser detection distance, Professor Uhrich testified that the accident could have been avoided if Seidler had simply removed her foot from the accelerator.

Appellant also presented the testimony of an economics expert, Reuben Slesinger, to establish the amount of Vencinn's lost future earnings. Appellees' counsel filed a motion *in limine* with regard to this testimony on the basis that since Vencinn was under no legal obligation to support his parents or siblings at the time of his death, evidence of future earnings could not be brought before the jury under the guise of "loss of support" under R.C. 2125.02.

The trial court initially overruled the motion *in limine* and allowed Slesinger to give testimony as to Vencinn's lost future earnings based on four career scenarios: Vencinn obtaining a four-year college degree, his obtaining a Master's degree, his obtaining a professional degree, and his becoming an FBI agent. After Slesinger gave his testimony, however, the trial court determined that the jury should not consider it, since there was no evidence of loss of support or loss of inheritance. Despite the trial court's inclination in this regard, appellant's counsel requested that the court instruct the jury that appellant was entitled to recover for loss of support from the reasonably expected earning capacity of the decedent. After a lengthy, on-the-record discussion in chambers, the trial court determined that the jury would not be so charged.

The trial court subsequently instructed the jury:

"In this case we actually have two causes of action. One, a survivor's cause of action where the jury can consider damages for the decedent's fright and terror, if any, before his death. You may not in this case consider potential future earnings.

"A second cause of action, called a wrongful death action, is also asserted here. Because one element of damages in such cases involves reasonable earning capacity you were permitted to hear testimony as to the decedent's potential future income. You were given a final estimate in that testimony. Because the experts did not give any opinion as to loss of support or loss of inheritance, you

may not consider that final figure for any purpose in determining damages on the other factors."

During its deliberations, the jury sent the following question to the trial court:

"Can you consider future earnings in the second cause of action called a wrongful death action?"

In response, the trial court instructed the jury that it was not to consider loss of future earnings and referred the jury to page 11 of the written jury instructions.

It is noted that Vencinn's sister, Letoya Bryant, testified at trial that she provided approximately $600 per month support to her and Vencinn's mother and that, at the time of trial, her mother was living with her. However, there was no direct testimony to the effect that Vencinn would also support his mother when he got older. It is also noted that there was evidence that Vencinn's sister was well educated, had graduated cum laude from South Carolina State University and was employed with the Department of Justice, Office of the Inspector General. Further, there was evidence that Vencinn's mother lacked a college degree. There was also testimony that Vencinn's natural father was a police officer, that Vencinn wanted to be an FBI agent when he grew up, and that Vencinn had founded a crime fighters club in pursuit of this interest.

The jury ultimately returned a verdict in favor of appellee Seidler but against appellees David Dattilo, Richard Sheppard, and James Hall in the amount of $200,000. The jury indicated in its verdict form that, of this amount, $3,800 was for funeral expenses and $16,600 for medical expenses.

Appellees Dattilo, Sheppard, and Hall then moved for a postverdict setoff in the amount of the previous settlements with the other defendants under R.C. 2307.32(F). The trial court subsequently ordered the setoff and reduced the verdict to $90,000.

Appellant then filed this timely appeal. Appellees Seidler, Dattilo, Sheppard, and Hall filed notices of cross-appeal. It is noted that appellant has since dismissed her appeal as to appellee Sheppard.

Appellant has listed six assignments of error. The first three assignments of error relate to the trial court's instruction to the jury that it should not consider testimony with regard to Vencinn's lost earning capacity. Those assignments of error are:

"1. The trial court erred by refusing to allow the jury to consider expert testimony on decedent's lost earning capacity for the purpose of establishing Appellant's loss of support under Ohio's wrongful death statute.

"2. The trial court erred by permitting Ms. Howard to present expert testimony to the jury on decedent's lost earning capacity and then refusing to allow the jury to consider such testimony, and by refusing to give a curative instruction to the jury to mitigate the resulting prejudice to Ms. Howard.

"3. The trial court erred by refusing to permit the jury to consider testimony from the decedent's mother, brother, and sister relating to what the decedent might have contributed to them had he lived for the purposes of determining their loss of support resulting from the reasonably expected earning capacity of the decedent."

Appellant first argues that, under Ohio's wrongful death statute, evidence of loss of support from the expected earning capacity of the decedent is clearly admissible. R.C. 2125.02(B) provides:

"(B) Compensatory damages may be awarded in an action for wrongful death and may include damages for the following:

"(1) Loss of support from the reasonably expected earning capacity of the decedent * * *."

Appellant argues that the trial court erred in instructing the jury that it could not consider loss of support from the expected earning capacity of Vencinn and that the trial court committed further prejudicial error by first allowing the jury to hear Slesinger's testimony and then refusing to give a curative instruction when it changed its position. Appellant also argues that the jury should have been permitted to consider lay testimony as to what Vencinn might have contributed to the support of his family.

Appellant argues that evidence of lost earning capacity is not speculative simply because the decedent is a minor. Appellant argues that a requirement of direct evidence of specific monetary loss would effectively foreclose the proof of any damages, except funeral expenses, for the wrongful death of a child. Appellant argues that the 1982 amendment to the wrongful death statute allows parents to recover damages for the loss of support and services caused by the wrongful death of their children. As a remedial statute, appellant argues, it should be construed liberally, citing *Burton v. DePew* (1988), 47 Ohio App.3d 107, 547 N.E.2d 995.

In response, appellees Dattilo and Hall argue that the trial court properly instructed the jury with regard to consideration of Vencinn's lost future earnings. Appellees argue that Slesinger's opinion that Vencinn had suffered a loss of earnings which had a present value of over $1,000,000 was speculative in light of the statistical information regarding the percentage of black males who actually attend college and achieve the occupation scenarios on which Slesinger's testimony was based.

Appellees further argue that Ohio law requires future damages to be proven to a reasonable degree of certainty and that speculative expert and lay testimony that attempts to calculate the future earnings of a deceased minor child should not be allowed under the 1982 amendment to the wrongful death statute. Appellees argue that while under the statute loss of support based upon the decedent's reasonably expected earning capacity is a recoverable item of damage, evidence of earning capacity is proper only where the parents or siblings are actually being supported by the decedent at the time of death. As no such evidence was submitted in this case, appellees argue that the trial court's instruction was proper.

The first three assignments of error require us to consider two questions. The first is whether evidence of loss of support from the reasonably expected earning capacity of the decedent is admissible where the decedent was a minor at the time of death and had never been gainfully employed.

The case of *Immel v. Richards* (1950), 154 Ohio St. 52, 42 O.O. 128, 93 N.E.2d 474, provides guidance on this issue. In *Immel,* the father of a nine-month-old decedent brought a wrongful death action under a predecessor to R.C. 2125.01. After a trial, judgment was entered in favor of the plaintiff father, and the defendant appealed, arguing that there had been no pecuniary injury shown, since there was no evidence that the baby had provided services or support to his parents prior to his death.

On appeal to the Supreme Court, the court held that damages for the loss of future support may be recovered by the parents of a minor deceased child notwithstanding the fact that the child had never been gainfully employed. The court further held that such damages were to be measured by the experience and judgment of the jury, enlightened by a knowledge of the age, sex, and physical and mental characteristics of the child, supplemented with evidence as to the position in life and earning capacity of the parents.

In reaching its decision, the *Immel* court further noted, at 56, 42 O.O. at 130, 93 N.E.2d at 476:

" 'The mental, moral and physical characteristics of the child must be considered, as well as his expectation of life, in determining the extent of the pecuniary aid which he would probably give to his parents, and the jury are authorized to take into consideration the probable future increase of earning capacity of the child.' " Quoting *Ochsner v. Cincinnati Traction Co.* [1923], 107 Ohio St. 33, 140 N.E. 644.

The Supreme Court's decision in *Immel* was in line with a number of the court's previous cases in which it recognized the right of parents to recover damages based upon the lost services and future earning capacity of a decedent

child notwithstanding the fact that the child had never been gainfully employed prior to his or her death.  See *Karr v. Sixt* (1946), 146 Ohio St. 527, 33 O.O. 14, 67 N.E.2d 331;  *Cincinnati Street Ry. Co. v. Altemeier* (1899), 60 Ohio St. 10, 53 N.E. 300;  *Ochsner v. Cincinnati Traction Co.*, *supra.*

We recognize that the previously cited cases were decided at a time when, under previous wrongful death statutes, damages were limited to the "pecuniary loss" of the beneficiaries of the decedent.  "Pecuniary loss" did not include the loss of the society, companionship and comfort of the decedent.  See *Keaton v. Ribbeck* (1979), 58 Ohio St.2d 443, 12 O.O.3d 375, 391 N.E.2d 307; *Kennedy v. Byers* (1923), 107 Ohio St. 90, 140 N.E. 630. Thus, in the case of the death of a young child, plaintiff-parents would not have been able to recover anything more than nominal damages if the courts had determined that future earnings of the minor child were too speculative to be recoverable.  It is apparent that Ohio courts considered this result unacceptable.  See *Immel, supra; Nelson v. Horton* (1971), 31 Ohio App.2d 159, 60 O.O.2d 246, 287 N.E.2d 108; *Cincinnati Traction Co. v. Beebe* (1914), 3 Ohio App. 213, affirmed (1915), 91 Ohio St. 418, 110 N.E. 1057.

In the instant case, appellees' counsel argued that the broad definition of "pecuniary loss" was no longer warranted under the current statute given the expanded list of items for which damages could be recovered.  Based upon the following colloquy, the trial court apparently agreed with appellees' argument:

"MR. LIVINGSTON: I guess, Your Honor, I guess the basis of your ruling is you don't believe under Ohio law that a child who hasn't yet started earning a living is under that portion of the statute that deals with loss of support?

"THE COURT: That's true.

"MR. LIVINGSTON: That's the basis for excluding.

"THE COURT: And that may be error.  And if you get a terrible verdict, I would like some Court of Appeals to tell me whether or not it's error.  I don't like limiting damages, but I also have to try to follow what I think the wrongful death statute holds."

■ Contrary to appellees' argument and the trial court's concurrence with it, we have found nothing by way of legislative history or Ohio Supreme Court authority tending to suggest that by expanding the scope of recoverable damages in wrongful death actions, the legislature intended to limit an item of damage clearly allowable under pre–1982 case law.  As a matter of statutory construction, we presume that the legislature was aware of the current case law when it drafted its amendments to the wrongful death statute.  See *Seeley v. Expert* (1971), 26 Ohio St.2d 61, 72–73, 55 O.O.2d 120, 126–127, 269 N.E.2d 121, 128–129; *Spitzer v. Stillings* (1924), 109 Ohio St. 297, 142 N.E. 365; *State ex rel. Durr v.*

*Spiegel* (1914), 91 Ohio St. 13, 109 N.E. 523. We further note that, in at least one case decided since 1982, the Supreme Court has apparently adhered to its previous position that parents may recover for the loss of support from the expected earning capacity of a deceased minor child. See, generally, *Gallimore v. Children's Hosp. Med. Ctr.* (1993), 67 Ohio St.3d 244, 250–251, 617 N.E.2d 1052, 1056–1057.

In the instant case, appellant offered testimony regarding Vencinn's age, mental and physical characteristics, activities, and plans for his future. Appellant further offered testimony regarding the financial support offered by Vencinn's sister to his mother, who lacked a college degree. Further, testimony was offered with regard to Vencinn's family background and the education and earning capacity of other members of his family.

Based upon all this testimony, we find that there was an issue created for the trier of fact's determination as to whether Vencinn would have provided support to his family members, particularly his mother, after emancipation, and the dollar amount of that support. We thus find that the trial court erred when it instructed the jury that it could not award damages for loss of support from the reasonably expected earning capacity of Vencinn.

Second, we must determine whether the trial court erred when it refused to allow the jury to consider Dr. Slesinger's testimony as to Vencinn's expected earning capacity.

■ Having determined that loss of support from Vencinn's reasonably expected earning capacity was a proper item of damage to be considered in the instant case, we find that the weight to be given Dr. Slesinger's testimony was clearly a matter for the trier of fact.

While appellees suggest that the only relevant inquiries when determining loss of support are the age, sex, and physical and mental condition of the minor child, as well as the age and earning capacity of the parents, we note that Evid.R. 702, as it read at the time of trial, allowed a witness with appropriate expertise to testify as an expert if the testimony would assist the trier of fact. In the instant case, we find that Dr. Slesinger's testimony would have been helpful to the jury in determining what, if anything, Vencinn would have contributed to the support of his mother.

Contrary to appellee's assertions, we do not think it necessary that Dr. Slesinger was required to state with specificity the amount of support that Vencinn would have given to his mother. However, we find that Dr. Slesinger's testimony with regard to the reasonably expected earning capacity of Vencinn would have been helpful to the jury in making its determination as to what, if anything, Vencinn would have contributed to the support of his mother.

■ As a matter of course, a jury must weigh evidence in determining the probability of lost future earnings of a decedent, whether that decedent be an adult with a wage earning history or a child too young to have been a wage earner at the time of death. Under the facts of the instant case, there was evidence that Vencinn was a normal eleven-year-old boy who had a good relationship with his family and who had aspirations to do something with his life in adulthood. There was clear evidence that his sister was well educated and well employed. There was also evidence that his sister provided financial support to Vencinn's mother. Upon these facts, there clearly was a foundation laid for the issue of whether Vencinn would have also provided support in adulthood to his mother.

Rather than foreclosing evidence on this issue, in our view, the trial court should have permitted the development of testimony on this issue, by all parties, so that when the time came for deliberation, the jury would have had all it needed to make its factual determinations and to accept or reject, as it saw fit, the conclusions of the witnesses. The exclusion of Dr. Slesinger's testimony, under the facts of this case, was reversible error.

■ As a final matter, appellant argues in her third assignment of error that the trial court erred by not allowing her counsel to make reference during closing arguments to Vencinn's family's testimony relating to loss of support. Based upon the foregoing discussion, we find that, under the facts of this case, this was reversible error.

Based upon the foregoing, we find that the first three assignments of error have merit.

In her fourth assignment of error, appellant argues:

"The trial court erred by fundamentally misstating to the jury the testimony of Ms. Howard's lighting expert, and by failing to give a curative instruction to mitigate the resulting prejudice to Ms. Howard."

In this assignment of error, appellant cites the previously cited statement of the trial court, located at page 628 of the transcript, that it would not allow Dr. Uhrich to testify as to the longer detection range because of what the trial court believed the lighting expert's testimony to be. Appellant argues that a trial court should never tell the jury what it heard or offer its own interpretation of such evidence. Appellant argues that the jury members heard Kosmatka's testimony and that they were fully capable of making their own determination as to what Kosmatka had said. Appellant argues that it was within the sole province of the jury to determine whether Kosmatka's opinion was that the detection distance was 222 feet or that it was a range between 222 feet and 305 feet. Appellant argues that the trial court misled the jury by informing it that Kosmatka's

maximum detection distance was nearly thirty percent less than what Kosmatka had actually told the jury.

■ A review of the relevant portions of the transcript as previously set forth in this opinion establishes that Kosmatka testified that 222 feet was the proper detection distance and that the 305-foot distance was a mere possibility. Therefore, appellant was not prejudiced by the statements of the trial court. The fourth assignment of error is thus found to be without merit.

In the fifth assignment of error, appellant argues:

"The trial court erred by relying on a disputed stipulation to admit into evidence a police accident report that it conceded was clearly inadmissible."

■ In the fifth assignment of error, appellant cites a number of places in the transcript where the parties discussed the use of the accident report prepared by the Austintown Police Department. Appellant notes that, at page 27 of the transcript, the trial court granted appellant's motion *in limine* with regard to the accident report. Appellant further argues that Seidler's counsel ignored the granting of the motion *in limine* in opening statements when he stated that there was no reference in the police report that Seidler's speed was unreasonable or excessive. Further, appellant cites pages 259–295 of the transcript and argues that the trial court initially recognized that any conclusions made by the police report were not admissible but nonetheless permitted reference to them.

Appellant argues that the trial court erred in ignoring the parties' dispute over the scope of the stipulation by admitting otherwise inadmissible evidence. In effect, appellant argues that the trial court held appellant to a stipulation which she never made or intended to make. Appellant argues that the trial court's ruling allowing all of the police report's conclusions into evidence severely prejudiced appellant's case against appellee Seidler. Appellant argues that the police officers' conclusions regarding Seidler's speed and other conduct not only amounted to mere conjecture but also involved the ultimate issue of whether, and to what extent, Seidler was negligent.

In response, appellee Seidler first notes that appellant did not formally request to withdraw the police report as an exhibit following the stipulation. Appellee argues that the stipulation was agreed to by all parties and that the stipulation was entered into before the commencement of opening statements and testimony. Appellee Seidler argues that while appellant's motion *in limine* was granted, preventing any reference to the fact that no citations were issued in the matter, the motion *in limine* did not prevent counsel from commenting on other portions of the police report that had been admitted into evidence with no other restrictions.

A reading of the transcript from pages 124–138 and 259–295 shows that the parties had no clear agreement as to the scope of their stipulation regarding the police report. At various times during the discussions on the record, the trial court indicated that it did not think that the conclusions of the officer were admissible, that perhaps the parties were taking advantage of the fact that appellant's motion *in limine* had been an oral one, and that the court was concerned that the parties were trying to get something into evidence indirectly which they could not get in directly.

Upon this state of the record, we cannot find that there was a stipulation as to the admissibility of conclusions found in or drawn from the police report. Since the conclusions in the report were otherwise inadmissible, see *Petti v. Perna* (1993), 86 Ohio App.3d 508, 513, 621 N.E.2d 580, 583, we find that the trial court erred in permitting reference to them.

The fifth assignment of error is found to have merit.

In the sixth and final assignment of error, appellant argues:

"The trial court erred in finding that R.C. 2307.32 was constitutional, even though that statute impermissibly required it to deduct from the jury verdict the amount of settlements paid by former defendants Morgan and Demler in the sum of $110,000.00."

In the sixth assignment of error, appellant urges this court to find that R.C. 2307.32 is unconstitutional. By way of citation to additional authority, filed March 21, 1996, appellant also argues that the setoff was erroneously ordered by the trial court in the instant case, since the jury did not consider the potential liability of the settling defendants.

First, we decline at this time to make a determination as to the constitutionality of R.C. 2307.32. It is well established that a constitutional argument cannot be raised for the first time on appeal. See *State v. Smith* (1991), 61 Ohio St.3d 284, 293, 574 N.E.2d 510, 518–519; *State ex rel. Specht v. Oregon City Bd. of Edn.* (1981), 66 Ohio St.2d 178, 182, 20 O.O.3d 191, 193–194, 420 N.E.2d 1004, 1007. While it appears that appellant did bring her argument to the attention of the trial court by way of one paragraph in a letter addressed to the trial court, we find that the constitutionality issue was not developed enough below to merit our consideration here.

With regard to the application of R.C. 2307.32(F)(1), appellee argues that the trial court properly ordered the setoff, citing *Ziegler v. Wendel Poultry Services, Inc.* (1993), 67 Ohio St.3d 10, 615 N.E.2d 1022. In *Ziegler,* one of two defendants entered into a "high-low" agreement with the plaintiff whereby the defendant guaranteed the plaintiff a minimum payment of $325,000 regardless of the jury verdict, and payment of up to $450,000 if the jury determined that the settling

defendant was liable to that extent. The jury subsequently awarded the plaintiff $1,607,735 in damages, attributing one hundred percent liability to the nonsettling defendant. The trial court then overruled the nonsettling defendant's motion for a setoff. On appeal, the Supreme Court found that the setoff should have been ordered, since, without it, the plaintiff would have obtained a double recovery in a case where the jury determined that the total damages suffered had been $1,607,735, a result that R.C. 2307.32(F)(1) was clearly designed to prevent.

■ The instant case is distinguishable from *Ziegler*. The jury verdict form in the instant case reads:

"We, the jury, * * * find the issues in this case in favor of the plaintiff, and assess the amount due to the plaintiff from the defendant(s), (insert the name(s) of the defendant(s) against whom you rendered judgment) * * *."

In *Ziegler*, the jury considered and awarded an amount representing the total damages suffered by the plaintiff. By contrast, in the instant case, a reading of the above-quoted jury verdict form shows that the damages considered by the jury were only those caused by the three defendants before it. The setoff was therefore not necessary to avoid a double recovery, and the trial court erred in ordering it.

Appellant's sixth assignment of error has merit.

Appellees Dattilo and Hall have presented one assignment of error in their cross-appeal, which is further broken down into three issues. The assignment of error is:

"The trial erred in failing to direct a verdict in favor of James Hall and David Dattilo."

Appellees first argue that appellant failed to establish a duty owed to Vencinn by Dattilo and Hall.

Appellees next argue that appellant failed to establish damages proximately caused by the actions of Dattilo and Hall. Appellees argue that a defendant cannot be held liable for damages when his acts constitute a remote rather than proximate cause. Appellees argue that when an intervening act breaks the causal connection between a defendant's actions and the injury, no liability attaches.

Appellees argue that the evidence demonstrated that any conduct by Dattilo or Hall was, at most, a remote rather than a proximate cause of the injuries.

Appellees argue that the remote nature of their conduct is found in the testimony of a witness, Michelle Fiscus. Fiscus testified that she went to her porch and saw Vencinn standing in front of her driveway. Appellees argue that at this point, the causal connection between the alleged conduct of Dattilo and

Hall had ended. Fiscus testified that Vencinn then threw rocks at the group and yelled, "Your mother." Appellees note that, after this, only one boy ran after Vencinn and that this boy's conduct (Michael Morgan's) was the sole cause of Vencinn's death.

Appellees then argue that there was no evidence that would allow either the jury to find Hall or Dattilo liable as having aided and abetted Michael Morgan or allow a finding of liability based upon the theory of concert of action. Appellees argue that a defendant's mere presence is insufficient to charge him with responsibility.

There was ample eyewitness testimony presented upon which the jury could determine that appellees Dattilo and Hall threatened Vencinn and then chased him in a manner that ultimately caused his death. As appellant argues, it is clear that appellees had the duty to leave Vencinn alone, and the jury had evidence before it that they violated this duty. It is also clear that there was evidence that the finding of liability against appellees Dattilo and Hall was based on more than their mere presence at the scene of the accident.

Appellees Dattilo and Hall's cross-assignment of error is found to be without merit.

It is noted that appellee Seidler filed a notice of cross-appeal on April 13, 1994 from certain rulings made by the trial court including, but not limited to, the trial court's overruling of Seidler's motion for a directed verdict. However, appellee Seidler did not brief any of her cross-appeal issues and merely requested that this court affirm the judgment of the trial court as to her. Therefore, this court need not rule on those issues.

Based upon the foregoing, the judgment of the trial court is hereby reversed, and the cause is remanded for a new trial according to law and consistent with this opinion.

*Judgment reversed*
*and caused remanded.*

JOSEPH E. O'NEILL, P.J., and COX, J., concur.