*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BETHANY ZEHEL, Individually and as Personal
Representative of the ESTATE OF ROWYN
VASQUEZ,

        Plaintiff-Appellee,

v

CLARK EDWARD NUGENT, M.D., DEBORAH
BERMAN, M.D., JUSTIN JUNN, M.D., ALICE
MAY CHI, M.D., and ANGELA SIMMEN
KELLEY, M.D.,

        Defendants-Appellants.

FOR PUBLICATION
December 1, 2022
9:35 a.m.

Nos. 357511, 358134
Washtenaw Circuit Court
LC No. 19-000388-NH

Before: RONAYNE KRAUSE, P.J., and JANSEN and SWARTZLE, JJ.

RONAYNE KRAUSE, P.J.

In this medical malpractice action under the wrongful-death act, MCL 600.2922, defendants appeal by leave granted[1] three orders of the trial court denying, in relevant part, their motions for summary disposition. In Docket No. 357511, the trial court denied defendants' motion for summary disposition pursuant to MCR 2.116(C)(8) (failure to state a claim upon which relief can be granted) as to plaintiff's claims for lost future earnings. In Docket No. 358134, the trial court denied in part two motions for summary disposition pursuant to MCR 2.116(C)(10) (no genuine issue of material fact), regarding defendants' assertion that plaintiff failed to provide adequate expert testimony. We consolidated the two appeals. We now affirm in part, reverse in part, and remand for further proceedings.

---

[1] *Estate of Rowyn Vasquez v Nugent*, unpublished order of the Court of Appeals, entered October 8, 2021 (Docket No. 357511); *Estate of Rowyn Vasquez v Nugent*, unpublished order of the Court of Appeals, entered October 8, 2021 (Docket No. 358134).

## I. BACKGROUND

Defendants are medical doctors who specialize in obstetrics and gynecology. Defendants were involved in the Cesarean section delivery of plaintiff's twins. One of the twins, Rowyn, did not survive. Plaintiff commenced claims for "medical negligence" against each of the defendants. Very generally, plaintiff contended that she was admitted to the hospital for preterm ruptures of the membranes of both twins, and although their "fetal monitor strips were reassuring at the time of admission," an ultrasound revealed that "Twin B" was in a breech position and would require a C-section once active labor began. However, defendants allegedly delayed in performing a C-section following the commencement of labor and failed to properly monitor plaintiff's progress. It was eventually discovered that "Twin B" was "in a back down traverse lie and unable to safely be delivered vaginally," by which time "Rowyn's head had become deeply wedged in Bethany's pelvis." It took eight minutes and considerable force to extract Rowyn, during which time Rowyn became hypoxic. Rowyn was intubated shortly thereafter. However, Rowyn suffered a seizure about two hours later, and it was determined that Rowyn had suffered extensive intracranial bleeding and two skull fractures. Following an assessment by neurologists that Rowyn "had suffered a severe neurologic injury at birth from which she would not recover," Rowyn was removed from life support and died.

One of the issues significant to this appeal is that, during the delivery, it was noted that "excessive uterine tone" prevented Rowyn from being elevated. Plaintiff's experts agreed that the delivery was "ultimately complicated by excessive uterine tone." "Tone" generally refers to "the tension present in resting muscles." *Stedman's Medical Dictionary* (26th ed). "Excessive uterine tone" was explained by the experts to be synonymous with "hypertonic uterus" or "a Bandl's ring." A Bandl's ring, itself synonymous with a pathologic retraction ring, is "a constriction located at the junction of the thinned lower uterine segment with the thick retracted upper uterine segment, resulting from obstructed labor; this is one of the classic signs of threatened rupture of the uterus." *Id*. More generally, the phenomenon was explained to be "titanic contractions" of the uterus that preclude manipulation of the uterus or the baby. As will be discussed, at issue is not the nature of excessive uterine tone, but rather its causes and predictability.

Following the trial court's grant of partial summary disposition in favor of defendants,[2] the following claims against each remain:

> b. Perform and appreciate a thorough history and physical examination and reevaluate the patient's condition at regular and proper intervals;

---

[2] In relevant part, the trial court granted summary disposition in defendants' favor as to a number of plaintiff's claims. The trial court granted summary disposition in favor of Dr. Berman and dismissed the claims against her, so we are uncertain why Dr. Berman remains a named defendant-appellant. The trial court also dismissed all claims by Zehel in her capacity as an individual. Plaintiff has not cross-appealed.

c.  Educate and supervise any and all health care professionals providing care and/or treatment to Bethany Zehel, including but not limited to, resident physicians and/or nurses;[3]

d.  Personally examine and reevaluate Bethany's condition and the progress of labor at regular and proper intervals;

i.  Perform vaginal exams at appropriate and regular intervals to assess progress of labor;

j.  Monitor timing and intensity of contractions at appropriate intervals to assess progress of labor;

k.  Recognize when active progression of labor has begun and a C-section can safely be performed;

l.  Advise Bethany that a C-section is needed to deliver her baby and preserve fetal well-being;

m.  Perform a C-section without delay and complication;

q.  Provide appropriate neonatal resuscitation at birth without unnecessary delay and/or arrange for an appropriately trained medical professional, including, but not limited to, a pediatrician or neonatologist, to be present at the time of delivery to effectively resuscitate newborn;

r.  Any and all acts of negligence as identified through additional discovery.

In Docket No. 358134, defendants appeal the trial court's denial of partial summary disposition specifically as to allegation (q), contending that plaintiff failed to provide any expert testimony that was critical of their efforts at resuscitating Rowyn.  Also in Docket No. 358134, defendants appeal the trial court's denial of their motion for summary disposition regarding proximate causation, contending that plaintiff failed to provide expert testimony to the effect that excessive uterine tone could be predicted.  In Docket No. 357511, defendants argue that, as a matter of law, plaintiff cannot recover damages under the wrongful-death act under the circumstances of this case.

## II.  STANDARD OF REVIEW

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law.  *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).  When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the non-moving party and grants summary

---

[3] The parties stipulated to dismiss any claims against nursing staff.

disposition only where the evidence fails to establish a genuine issue regarding any material fact. *Id*. at 120. A motion brought under MCR 2.116(C)(8) should be granted only where the complaint is so legally deficient that recovery would be impossible even if all well-pleaded facts were true and construed in the light most favorable to the non-moving party. *Id*. at 119. Only the pleadings may be considered when deciding a motion under MCR 2.116(C)(8). *Id*. at 119-120. Whether a particular kind of damages is recoverable for a given cause of action is a question of law, which we review de novo. See *Price v High Pointe Oil Co, Inc*, 493 Mich 238, 242; 82 NW2d 660 (2013). The interpretation and application of statutes, rules, and legal doctrines is reviewed de novo. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008). Our review of a trial court's decision regarding a motion for summary disposition is generally restricted to the record as of the time of the trial court's ruling. *Quinto v Cross & Peters Co*, 451 Mich 358, 366 n 5; 547 NW2d 314 (1996); *Peña v Ingham Co Road Comm*, 255 Mich App 299, 313 n 4; 660 NW2d 351 (2003).

### III. WRONGFUL DEATH DAMAGES

In Docket No. 357511, defendants argue that because Rowyn had no dependents or spouse, and Rowyn was not providing support to any other person, plaintiff may not recover damages for Rowyn's potential future earnings. Defendants also argue that any calculation of potential future wages for an infant who was born ten weeks premature and who died a few weeks after birth is necessarily impermissibly speculative. We disagree with the former argument, in part because this wrongful death action is fundamentally to recover Rowyn's lost future earning potential rather than specifically Rowyn's lost future wages. However, under the facts of this case, we agree with the latter argument that Rowyn's lost future earning potential is speculative.

Pursuant to MCL 600.2921, "[a]ll actions and claims survive death." However, "[a]ctions on claims for injuries which result in death shall not be prosecuted after the death of the injured person except pursuant to [the wrongful-death statute, MCL 600.2922]." *Id*. Such claims may be brought by the personal representative of the decedent's estate to the same extent the decedent could have brought those claims if the decedent had survived. MCL 600.2922(1) and (2). The decedent's parents are within the class of persons entitled to damages under the wrongful-death statute. MCL 600.2922(3)(a). Pursuant to MCL 600.2922(6),

> In every action under this section, the court or jury may award damages as the court or jury shall consider fair and equitable, under all the circumstances including reasonable medical, hospital, funeral, and burial expenses for which the estate is liable; reasonable compensation for the pain and suffering, while conscious, undergone by the deceased during the period intervening between the time of the injury and death; and damages for the loss of financial support and the loss of the society and companionship of the deceased.

Our Supreme Court has explained that "the wrongful-death act is essentially a 'filter' through which the underlying claim may proceed," noting that a wrongful-death action is not created upon the death of the decedent, but rather *survives* the death of the decedent. *Wesche v Mecosta Co Road Comm*, 480 Mich 75, 88-89; 746 NW2d 847 (2008).

A. ENTITLEMENT TO DAMAGES

In *Wesche*, our Supreme Court explained that a wrongful-death action is a derivative claim brought by a decedent's personal representative in the decedent's shoes, the touchstone being whether the decedent could have maintained the action if death had not occurred. *Wesche*, 480 Mich at 90-91. Our Supreme Court explicitly described *Endykiewicz v State Highway Comm*, 414 Mich 377; 324 NW2d 755 (1982), as having espoused "a repudiated understanding of the wrongful-death act" to the extent the *Endykiewicz* Court described a wrongful-death claim as a new action brought for the benefit of the beneficiaries named in the wrongful-death statute. *Wesche*, 480 Mich at 90.

In *Denney v Kent Co Road Comm*, 317 Mich App 727, 731-732; 896 NW2d 808 (2016), this Court explained that although lost earnings are not explicitly specified in MCL 600.2922(6), the Legislature's use of the word "including" meant that the enumerated list of kinds of damages available is not exhaustive; "[t]herefore, damages for lost earnings are allowed under the wrongful-death statute." In *Denney*, the decedent could have brought a claim sounding in negligence under the highway exception to governmental immunity for lost earnings resulting from bodily injury that the decedent suffered when two potholes caused the decedent to lose control of his motorcycle. *Id*. at 729, 735-737. Under the circumstances of that case, this Court agreed that a claim for lost financial support could not have been brought under the highway exception. *Id*. at 736. However, this Court observed that "a claim for lost financial support under the wrongful-death statute is not the same as a claim for lost earnings," the former being a claim brought by a person who depended upon the decedent, and the latter being a claim brought by the decedent on his or her own behalf. *Id*. at 736-737. "Because the damages are distinct, the fact that the wrongful-death statute allows for recovery of lost financial support does not change the character of plaintiff's claim for damages for the decedent's lost earnings." *Id*. at 737. This Court further expressly rejected the argument that the distribution of damages to the decedent's beneficiaries rather than to the estate altered its analysis. *Id*.

Defendants argue that the *Denney* Court's interpretation of MCL 600.2922(6) irreconcilably conflicts with precedent from our Supreme Court. Under MCR 7.215(J)(1), however, "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990, that has not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals as provided in this rule." We observe that *Denney* has not itself been overturned by our Supreme Court. Furthermore, the relevant legal principle from *Denney* has also not been overturned by our Supreme Court. Nevertheless, defendants argue that *Denney* was wrongly decided at the time pursuant to *Baker v Slack*, 319 Mich 703; 30 NW2d 403 (1948). We disagree.

In *Baker*, our Supreme Court addressed whether, under a predecessor to the current wrongful-death statute, the decedent's adult son, with whom the decedent lived, could recover damages for "pecuniary injury as the result of [the decedent's] death." *Baker*, 319 Mich at 705-706. "No testimony was introduced to establish that anyone was or had been dependent upon [the] decedent for support or maintenance or that there was anyone to whom she was morally or legally obligated to contribute." *Id*. at 706. In fact, to the contrary, the decedent was dependent upon the son, although she did have some "established earning capacity." *Id*. at 707-708. At that time, the applicable statute provided:

Every such action shall be brought by, and in the names of, the personal representatives of such deceased person, and in every action the court or jury may give such damages, as, the court or jury, shall deem fair and just, with reference to the pecuniary injury resulting from such death, to those persons who may be entitled to such damages when recovered and also damages for the reasonable medical, hospital, funeral and burial expenses for which the estate is liable and reasonable compensation for the pain and suffering, while conscious, undergone by such deceased person during the period intervening between the time of the inflicting of such injuries and his death . . . [1940 CL Supp 14062; 1939 PA 297, § 2.]

Our Supreme Court interpreted the above language as providing for " 'pecuniary injury' to [the] decedent's surviving spouse or next of kin," which the Court observed "must be predicated upon the existence of some next of kin having a legally enforceable claim to support or maintenance by [the] deceased." *Baker*, 319 Mich at 714.

Critically, as discussed, our Supreme Court has explained that a wrongful-death action *used to be* construed as providing a new cause of action for the benefit of the beneficiaries. *Wesche*, 480 Mich at 90. The obsolete understanding of the nature of a wrongful-death action would be consistent with the *Baker* Court's analysis and holding. However, although not expressly cited in *Wesche*, our Supreme Court has necessarily—if implicitly—overruled the fundamental principle underlying the analysis and holding in *Baker*. We recognize that we are "bound to follow decisions by [our Supreme] Court except where those decisions have *clearly* been overruled or superseded," and we may not anticipate that a decision from our Supreme Court will be overturned. *Associated Builders & Contractors v City of Lansing*, 499 Mich 177, 191-192; 880 NW2d 765 (2016) (emphasis in original). Although "it is not always so easy to determine whether a case has been 'clearly overruled or superseded' by intervening changes in the positive law," such a conclusion may be easily drawn where "the Legislature has entirely repealed or amended a statute to expressly repudiate a court decision." *Id*. at 191 n 32. The statutory amendment at issue here is less extreme. Nevertheless, the wrongful-death act, as amended by 1931 PA 297, lacked the "including" language in the current statute. Thus, when it was considered by the *Baker* court, the wrongful-death act was not only understood to provide a fundamentally different kind of cause of action, the statute lacked the open-ended inclusiveness of the current statute. Either way, *Baker* has clearly been overruled or superseded, and it was no longer "good law" long before this Court decided *Denney*.

We therefore conclude that *Denney* is controlling, and pursuant to *Denney*, plaintiff may recover damages for Rowyn's lost future earnings to the same extent Rowyn could have recovered those damages had she survived.

## B. CALCULATION OF DAMAGES

"The general rule is that remote, contingent, and speculative damages cannot be recovered in Michigan in a tort action." *Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 96; 706 NW2d 843 (2005). Although "there is inherent uncertainty regarding what the future may hold," "the measure of damages attributable to the loss of future earnings is left to the sound judgment of the jury despite the time element being uncertain, and the jury's

award will not be disturbed if reasonable and within the range of the testimony and proofs presented." *Id*. at 104, citing *Vink v House*, 336 Mich 292, 296-297; 57 NW2d 887 (1953). Recovery of damages is not precluded "for lack of precise proof," nor must a plaintiff provide "mathematical precision in situations of injury where, from the very nature of the circumstances, precision is unattainable, particularly in circumstances in which the defendant's actions created the uncertainty." *Hannay v Dep't of Transp*, 497 Mich 45, 79; 860 NW2d 67 (2014) (quotations omitted).

In an action for medical malpractice, an injured party may recover damages for future economic losses. MCL 600.1483(2); *Taylor v Kent Radiology*, 286 Mich App 490, 519; 780 NW2d 900 (2009). "Although economic losses are not defined under MCL 600.1483 or MCL 600.6305,[4] this Court has turned to the definition provided in MCL 600.2945(c) in order to determine whether a claim for damages in a medical malpractice action should be characterized as economic or noneconomic losses." *Taylor*, 286 Mich App at 519. Under MCL 600.2945(c), economic losses are defined as "objectively verifiable pecuniary damages arising from . . . loss of wages, loss of future earnings . . . or other objectively verifiable monetary losses." In *Hannay*, our Supreme Court explained that there was a difference between "work-loss damages" and "loss of earning capacity damages," the former being for income a person *would have* earned, and the latter being for income a person *could have* earned. *Hannay*, 497 Mich at 80-82.

In *Hannay*, our Supreme Court found evidence of work-loss damages for the plaintiff too speculative, despite evidence that the plaintiff was fully expected by a dentist and an experienced dental hygienist to become a dental hygienist, because too many contingencies needed to occur, such as admission to a dental hygienist program, successful completion of the program, and passing a licensing exam. *Hannay*, 497 Mich at 86-88. By necessary implication, loss of earning capacity permits much greater latitude. See *Health Call of Detroit*, 268 Mich App at 104. Nevertheless, the calculation must still be reasonably based on some evidence. See *May v William Beaumont Hosp*, 180 Mich App 728, 756; 448 NW2d 497 (1989)

We have found little clear authority in Michigan regarding a claim for a child decedent's lost wages or lost earning capacity. An early case did discuss a claim by parents for their child's lost earning potential. *Lincoln v Detroit & M. Ry Co*, 179 Mich 189, 193-195; 146 NW 405 (1914). However, at that time, "two statutes existed under which an action could be brought in cases of injury resulting in death: the survival act and the wrongful death act." *Hawkins v Regional Medical Laboratories, PC*, 415 Mich 420, 428; 329 NW2d 729 (1982). The two "claims were mutually exclusive and the measure of damages was substantially different." *Id*. at 430. We find *Lincoln* unhelpful because it was decided under a significantly different statutory scheme; furthermore, it concerned the child's earning potential during his minority, which would have belonged to the parents, and it did not discuss whether that earning potential was speculative. *Lincoln*, 179 Mich at 193-195. More recently, our Supreme Court discussed parents' entitlement under the wrongful-death act for loss of benefits they reasonably expected to receive from a deceased child after the

---

[4] Under MCL 600.6305(1)(b)(*ii*), a verdict or judgment rendered in a personal injury action shall include findings regarding any future damages, including "[l]ost wages or earnings or lost earning capacity and other economic loss."

child's majority, concluding that a majority of states permitted such recovery. *Thompson v Ogemaw Co Bd of Road Commrs*, 357 Mich 482, 488-489; 98 NW2d 620 (1959). The Court noted that "the most difficult of all questions involved in wrongful death cases" was "how definite must the evidence bearing upon pecuniary injury be to support a jury award?" *Id*. at 489-490. The Court concluded that, under the circumstances, there was evidence that the decedent had been healthy, intelligent, industrious, and had a history of earning money and contributing to family support, all of which "could reasonably be forecast into the future." *Id*. at 491-492.

The issue has also been addressed in other states.[5] In *Howard v Seidler*, 116 Ohio App 3d 800; 689 NE2d 572 (1996), the plaintiff brought a wrongful-death action for the death of her 11-year-old son, Vencinn, who died after being struck by an automobile. The plaintiff argued on appeal that the trial court erred by not allowing the jury to consider awarding damages for loss of the child's expected financial contributions to his mother's support. *Id*. at 808-809. The court held that, pursuant to Ohio law and precedent, parents were entitled to recover damages based on a minor child's lost future earning capacity, even if the child had never been gainfully employed; however, the trier of fact must consider "knowledge of the age, sex, and physical and mental characteristics of the child." *Id*. at 810-811. In *Howard*, the court found that "testimony regarding Vencinn's age, mental and physical characteristics, activities, and plans for his future," and testimony regarding Vencinn's sister's financial contributions to their mother's support, was sufficient to create an issue for the jury "as to whether Vencinn would have provided support to his family members, particularly his mother, after emancipation, and the dollar amount of that support." *Id*. at 812. The court also concluded that the trial court erred by excluding testimony from an economics expert to establish the decedent's lost future earnings. *Id*. at 807, 812-813. The court stated:

> As a matter of course, a jury must weigh evidence in determining the probability of lost future earnings of a decedent, whether that decedent be an adult with a wage earning history or a child too young to have been a wage earner at the time of death. Under the facts of the instant case, there was evidence that Vencinn was a normal eleven-year-old boy who had a good relationship with his family and who had aspirations to do something with his life in adulthood. There was clear evidence that his sister was well educated and well employed. There was also evidence that his sister provided financial support to Vencinn's mother. Upon these facts, there clearly was a foundation laid for the issue of whether Vencinn would have also provided support in adulthood to his mother.
>
> Rather than foreclosing evidence on this issue, in our view, the trial court should have permitted the development of testimony on this issue, by all parties, so that when the time came for deliberation, the jury would have had all it needed to make its factual determinations and to accept or reject, as it saw fit, the conclusions

---

[5] "Caselaw from sister states and federal courts is not binding precedent but may be relied on for its persuasive value." *Haydaw v Farm Bureau Ins Co*, 332 Mich App 719, 727 n 5; 957 NW2d 858 (2020).

of the witnesses. The exclusion of [the expert's] testimony, under the facts of this case, was reversible error. [*Id*. at 813.]

In *Mecca v Lukasik*, 366 Pa Super 149, 154; 530 A2d 1334 (1987), several teenagers were killed in an automobile accident. At issue was, in part, was whether an expert's testimony regarding the future earning potentials of the deceased teenagers was impermissibly speculative. *Id*. at 158-159. The plaintiffs introduced evidence of the decedents' educational and career plans, including one girl's expectation to complete college and medical school. *Id*. at 159-160. The court acknowledged the difficulty of "project[ing] future wage loss of a deceased child," but found that economic expert's projections were supported by testimony regarding the decedents' parents' and siblings' careers and academic achievements. *Id*. at 160-161.

We think the above cases establish that a child's expected future earning potential is not *inherently* too speculative to permit recovery. However, the record must permit some reasonable basis for personalizing an estimation specific to that particular child. In this case, tragically, there is simply no way to know anything about Rowyn's interests, aspirations, personality, strengths and weaknesses, academic performance, or any other characteristic that could be extrapolated. Rowyn was born prematurely and, implicitly, may have been conscious for two hours, if that. Rowyn never had the chance to display any individual personality whatsoever, and we think it too speculative to extrapolate from her parents or sibling. Unfortunately, on these facts, we must agree with defendants that there is no possible evidence of *Rowyn's* potential for future earnings.

We are therefore constrained to conclude that defendants are entitled to summary disposition in their favor as to plaintiff's claims for lost future earning potential.

## IV. EXPERT EVIDENCE REGARDING CAUSATION

As noted above, the delivery of Rowyn and her twin was allegedly complicated by "excessive uterine tone," which interfered with defendants' ability to carry out the delivery. Plaintiff's claims depend in part on the assertion that if the twins had been delivered by C-section earlier, the excessive uterine tone would likely not have occurred. In Docket No. 358511, defendants argue that the experts, including plaintiff's experts, agreed that excessive uterine tone was a rare and unpredictable event, and plaintiff had no evidence supporting her assertion that the delay caused the excessive uterine tone. We agree with the trial court that defendants fail to appreciate that unpredictability has degrees. The trial court properly denied summary disposition on this basis.

"In a medical malpractice case, plaintiff bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. Failure to prove any one of these elements is fatal." *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995) (citations omitted). Expert testimony is required to establish the applicable standard of care and demonstrate a breach of that standard. *Gonzalez v St John Hosp & Med Ctr (On Reconsideration)*, 275 Mich App 290, 294; 739 NW2d 392 (2007). Expert testimony may not be based on mere speculation, and there "must be facts in evidence to support the opinion testimony of an expert." *Teal v Prasad*, 283 Mich App 384, 395; 772 NW2d 57 (2009) (quotation omitted). Conversely, the expert testimony need not

be unassailable or uncontroverted in the scientific community. *Chapin v A&L Parts, Inc*, 274 Mich App 122, 127; 732 NW2d 578 (2007) (DAVIS, J.)

The admission of expert testimony is governed by MRE 702 and MCL 600.2955. MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MCL 600.2955 provides:

> (1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:
>
> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.
>
> (b) Whether the opinion and its basis have been subjected to peer review publication.
>
> (c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.
>
> (d) The known or potential error rate of the opinion and its basis.
>
> (e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.
>
> (f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.
>
> (g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

(2) A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field.

(3) In an action alleging medical malpractice, the provisions of this section are in addition to, and do not otherwise affect, the criteria for expert testimony provided in section 2169.

The trial court "may admit evidence only once it ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). "This gatekeeper role applies to *all stages* of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Gilbert*, 470 Mich at 782. However, "although MCL 600.2955(1) explicitly requires the trial court to *consider* all seven of the factors it enumerates, the statute does not require that each and every one of those seven factors must favor the proffered testimony." *Chapin*, 274 Mich App at 137 (DAVIS, J.); see also *Elher v Misra*, 499 Mich 11, 27; 878 NW2d 790 (2016).

Defendants raise a two-fold argument that plaintiff's experts' opinions (1) do not meet the test of scientific reliability, and (2) are insufficient to prove the causation element of plaintiff's malpractice action. In particular, they argue that plaintiff's experts' admission that excessive uterine tone is unpredictable negates any basis for concluding that Rowyn would have had a probability of a more favorable outcome if the C-section had been performed sooner. Defendants also assert that the correlation of strong contractions and the active phase of labor does not support plaintiff's theory because the experts admitted that strong contractions can occur in the latent phase of labor. Finally, defendants emphasize that there is no published literature supporting plaintiff's experts' opinion.[6]

The trial court's bench ruling is not a model of clarity and does not make it clear how much consideration it gave to all of the considerations enumerated under MCL 600.2955(1). Nevertheless, defendants primarily argue that plaintiff's experts' testimonies were inadmissible under MRE 702 because those testimonies were not supported by published, peer-reviewed literature. "Under MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible." *Edry v*

---

[6] Defendants also assert that "On reconsideration, [they] presented the trial court with numerous published, peer-reviewed articles finding no association between prolonged labor and excessive uterine tone during Cesarean sections." However, a trial court need not consider evidence presented for the first time on reconsideration that could have been presented initially. *Yachcik v Yachcik*, 319 Mich App 24, 42; 900 NW2d 113 (2017). Furthermore, as noted, our review is generally limited to the record before the court at the time of the motion for summary disposition. *Quinto*, 451 Mich at 366 n5; *Peña*, 255 Mich App at 313 n 4. In any event, such literature does not necessarily establish that plaintiff's experts' opinions are unreliable within the meaning of MRE 702. See *Chapin*, 274 Mich App at 127 (DAVIS, J.). The significance of any such literature would be better addressed to the trial court on remand.

-11-

*Adelman*, 486 Mich 634, 641; 786 NW2d 567 (2010). Nevertheless, our Supreme Court has also observed that although peer-reviewed and published literature is significant, its absence is not dispositive. *Id*. at 640; *Elher*, 499 Mich at 28. We note that in *Edry* and *Elher*, the proffered experts not only failed to provide any literature in support of their opinions, the expert in *Elher* admitted that he was relying on nothing more than his own personal beliefs, *Elher*, 499 Mich at 27-28; and the expert in *Edry* relied on printouts from websites that were contradicted by published literature that even the expert "acknowledged as authoritative," *Edry*, 486 Mich at 640-641. It would not be surprising that no literature existed regarding a rare phenomenon for which no experiment could be ethically performed, and at the time of the motion for summary disposition in this matter, defendants had proffered nothing to contradict plaintiff's experts' opinions.[7] Under the circumstances, it was therefore reasonable to rely upon plaintiff's experts' experience and background.

The gravamen of plaintiff's experts' testimonies, in relevant part, was that—as defendants argue—excessive uterine tone is a rare phenomenon, the cause of which is poorly understood. However, they emphasized that excessive uterine tone was nevertheless associated with prolonged labor; or, put another way, prolonged labor was a medically recognized risk factor for excessive uterine tone. Plaintiff was in labor for at least 24 hours and possibly more than 30 hours. Defendants are correct in asserting that there was no way to be absolutely certain that excessive uterine tone would not have occurred if the C-section had been commenced earlier. However, absolute certainty is not the standard. Plaintiff aptly points out that if a rare event has a known risk factor, taking away that risk factor would certainly make that event even more unlikely. We agree with defendants to the extent they argue that plaintiffs' experts failed to establish that an earlier C-section *would have* prevented her excessive uterine tone. However, because plaintiffs' experts did establish that an earlier C-section would have reduced the likelihood of her excessive uterine tone, we conclude that the trial court appropriately denied summary disposition on this basis.

## V. NEONATAL RESUSCITATION THEORY

Defendants finally argue in Docket No. 358134 that the trial court erred in failing to dismiss plaintiff's claims premised on defendants' alleged failure to provide appropriate neonatal resuscitation. We agree.

As discussed, a plaintiff in a medical-malpractice action must prove the element that the defendant breached the standard of care applicable to that specialty. *Wischmeyer*, 449 Mich at 484. In relevant part, plaintiff alleged that defendants failed to "[p]rovide appropriate neonatal resuscitation at birth without unnecessary delay." However, in the deposition testimony of one of plaintiff's experts, the expert was specifically asked, "Are you critical of the neonatal resuscitation?," to which he replied, "No." We have been unable to find any reference to neonatal resuscitation in the deposition testimony of plaintiff's other expert. On appeal, plaintiff provides only the conclusory statement that the trial court did not err in denying summary disposition as to

---

[7] We agree with defendants that nothing in their own deposition testimonies can reasonably be construed as an admission that plaintiff's theory of causation is probable. However, we also do not construe their deposition testimonies as stating that plaintiff's theory is impossible.

-12-

the neonatal resuscitation claim. Plaintiff further argues that "[i]f, as Defendants contend, there is no support for Plaintiff's particular claims relating to a failure to provide appropriate neonatal resuscitation, then there would be nothing to present to the jury or for the jury to decide relating to those claims." However, MCR 2.116(C)(10) specifically seeks to avoid the scenario of permitting a totally unsupported claim to go to a jury.

We conclude that defendants are entitled to summary disposition as to plaintiff's claims regarding neonatal resuscitation, because plaintiff has provided no expert evidence showing that defendants breached the standard of care applicable to those claims.

## VI. CONCLUSION

In Docket No. 357511, we hold that although the wrongful-death act permits recovery of lost future earning potential for a child, the calculation of such lost future earning potential is intrinsically too speculative for an infant who was born prematurely and who never had an opportunity to demonstrate any personal characteristics that would permit extrapolation. We therefore reverse the trial court's order denying summary disposition to defendants regarding plaintiff's claims for lost future earnings. However, because the state of the law was reasonably uncertain, and we do not agree with defendants' position in its entirety, we direct that the parties shall bear their own costs. MCR 7.219(A).

In Docket No. 358134, we hold that on the record available to the trial court at the time of the summary disposition motion, plaintiff's proffered expert testimonies were properly admissible regarding the probability that the excessive uterine tone could have been avoided by commencing the C-section earlier. We therefore affirm the trial court's denial of summary disposition as to the claims regarding untimely commencement of the C-section on that basis. However, plaintiff failed to provide any expert testimony supporting the claim that defendants failed to provide proper neonatal resuscitation. We therefore reverse the trial court's denial of summary disposition as to the claims regarding neonatal resuscitation. The parties shall bear their own costs, neither party having prevailed in full. MCR 7.219(A).

/s/ Amy Ronayne Krause

-13-